NOTICE
Decision filed 08/11/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 260228-U

NO. 5-26-0228

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| KATELYN JILL TATE, | ) | Fayette County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | No. 21-D-51 |
| v. | ) | |
| | ) | |
| ROGER DALE TATE, JR., | ) | Honorable |
| | ) | Allan F. Lolie, Jr. |
| Respondent-Appellant. | ) | Judge, presiding. |

JUSTICE HACKETT delivered the judgment of the court.
Justices Boie and McHaney concurred in the judgment.

**ORDER**

¶ 1  *Held*:  The circuit court did not err in allocating a majority of the parenting time over the parties' minor children to the petitioner mother where the record shows that the court balanced all relevant statutory factors and rendered a decision in accordance with the best interests of the minors. The judgment of the circuit court is affirmed.

¶ 2  The respondent, Roger Dale Tate, Jr., (Father), appeals *pro se*[1] from a February 17, 2026,

order of the Fayette County circuit court allocating a majority of the parenting time over the

parties' two minor children to the petitioner, Katelyn Jill Tate (Mother).[2] On appeal, Father

_____

[1]Father was represented by counsel below.
[2]We note that Father's notice of appeal did not specify the date of the judgment being appealed, as required by Illinois Supreme Court Rule 303(b)(2) (eff. July 1, 2017). However, this court entered an order on April 3, 2026, stating that "an examination of the case on Judici finds that the last order entered in this case was entered on February 17, 2026." While it did not appear that order was final and appealable, Illinois Supreme Court Rule 304(b)(6) (eff. Mar. 8, 2016) provides that an appeal can be taken from non-final

1

presents nine issues, all essentially challenging the circuit court's consideration of the evidence presented at the allocation hearing. For the following reasons, we affirm the judgment of the circuit court.

¶ 3                    I. BACKGROUND

¶ 4              A. Temporary Order and Further Proceedings

¶ 5    The parties in this case are the biological parents of Reagan T., a minor born in 2010, and Briggs T., a minor born in 2017. Mother filed a petition for dissolution of marriage on June 15, 2021. On August 2, 2021, Mother filed a motion for temporary relief regarding parenting time, decision-making authority, child support, maintenance, and attorney fees. In her motion, Mother alleged, *inter alia*, that she had been the primary caregiver for the minors and that they spent the majority of their time with her. Additionally, Father had "not contributed in any meaningful way to the minor children since the parties separated in January 2021." She therefore asked the circuit court to temporarily grant her a majority of the parenting time and Father reasonable parenting time, while allowing the parties to enjoy joint decision-making authority. On September 8, 2021, Father filed a petition for temporary allocation of parental responsibilities wherein he asked the circuit court to grant him and Mother joint decision-making responsibilities over the minors, as well as equal parenting time.

¶ 6    On January 10, 2022, the circuit court entered an agreed temporary order. That order provided, as relevant here, that Father would have parenting time on alternating weekends from Friday at 4:30 p.m. to Sunday at 7 p.m., and on Tuesdays and Thursdays from 4:30 p.m. to 8:30 p.m. All other parenting time was designated to Mother. The order further provided that each

---

appealable orders when they concern "[a] custody or allocation of parental responsibilities judgment or modification of such judgment entered pursuant to the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/101 *et seq.*) or Illinois Parentage Act of 2015 (750 ILCS 46/101 *et seq.*)" Our April 3, 2026, order concluded that Rule 304(b)(6) was applicable here.

parent would have "two non-consecutive weeks of summer parenting time" with the minors, and it also included a holiday parenting time schedule, providing that "[h]oliday parenting time shall take precedence over all other parenting time, including regular parenting time and summer parenting time (*i.e.* the two non-consecutive weeks each summer)." Finally, the order granted Mother and Father joint decision-making responsibilities with respect to education, healthcare, extracurricular activities, and religion. The record shows, and Father does not dispute, that he did not move to modify this agreement.

¶ 7     Ariana Thurnau, the minors' guardian *ad litem* (GAL), prepared a report that was filed on January 21, 2025. That report stated, as relevant here, that the parties lived about 10 minutes away from each other in Vandalia, Illinois. They also lived no more than 10 minutes away from the minors' school. Mother was a schoolteacher, while Father worked for Sheet Metals Workers Local 268 Union in Alton, which was approximately an hour from Vandalia. Since her job was local, Mother "was more available to take care of the day-to-day caretaking functions such as doctor's appointments and issues that arose at school during the day." Father "admitted that Mother primarily took care of these things," and that he had not participated in parent teacher conferences or Briggs' Individualized Education Plan (IEP) meetings.

¶ 8     Nevertheless, the GAL indicated that both parties were capable of taking care of the minors, and that she had "no concerns" about their ability to care for them. While Mother had done more for the minors over the years, there was not "a lack of desire or willingness on the part of [F]ather to do more for his children." The minors had good relationships with both parents. Reagan appeared to be "a little closer" to Mother because they could discuss "girl stuff." Reagan was involved in basketball on Tuesdays and Thursdays, during Father's parenting time. She sometimes

3

got upset that Father did not make it to her away games. She was also involved in a writer's club, where she enjoyed writing fantasy stories.

¶ 9 Likewise, Briggs was close to Mother and Father and loved them both. "Both parents showed interest in things that he was interested in, and Briggs appeared comfortable talking to [Mother] or [Father] about his interests." In addition, both parents had new significant others who lived in the respective homes. While Reagan liked Mother's boyfriend, Jason, she claimed that Father's girlfriend, Mandy, was "moody." She did not often see Mandy, who was usually asleep when Reagan was at Father's house due to her work hours. On one occasion, Mandy yelled at Reagan for playing her music after school while she was trying to sleep. "Raegan [*sic*] was upset because she felt she was playing it quietly and should be able to play her music after school."

¶ 10 In her report, the GAL stated that no restriction on parenting time was necessary. However, she did reference a domestic violence incident involving Father in 2021, where the children were present. The GAL reviewed the police report and charges brought against Father in Fayette County (case No. 2021-CF-5), which consisted of aggravated battery, threatening a public official, domestic battery, and resisting a peace officer. The police report "indicated that on January 10, 2021, [Father] had caused injuries to the back of [Mother's] neck, and the side of her face." Photographs were taken. Mother reported that Father had been drinking, and that he "held her down on the bed" as he "struck her in the face." When the police arrived, Father "was locked in the bedroom with Briggs, who was 3 years old at the time," and he was refusing to come out, telling officers "that they would have to break down the door and he would fight them if they did that." After about an hour, Father let the police remove Briggs from the bedroom. However, he then "resisted arrest by pushing an officer and locking himself back in the room to prevent being arrested," leading officers to kick down the door and tase him. Father pled guilty to resisting arrest

4

in April of 2023. No other incidents had been reported since January of 2021. Despite the incident, the minors "[did] not appear afraid of [Father,] nor did either child make statements or acknowledge they felt unsafe in [Father's] home."

¶ 11 The GAL report further stated that neither Mother nor Father sufficiently placed the minors' needs above their own. Instead, they placed their own wants above those of the minors. "Neither party like[d] to concede to the other parent, they both think they are right and the other is wrong." The minors reported that Father spoke poorly about Mother in front of them, and Reagan was aware that he had not paid child support and did not have the money to do more things with them.

¶ 12 After considering all the relevant factors, the GAL ultimately recommended the following parenting schedule:

> "Father having parenting time with the children on an alternating week schedule:
>
> Week 1: Wednesday afterschool until school the next morning.
>
> Week 2: Thursday afterschool until Monday morning."

The GAL also stated that Father should be allowed to attend all school events and extracurricular activities for the minors—whether they were during his parenting time or not—and that Mother should provide the minors' schedule to him as soon as she received it or instruct the school to provide him with any information regarding parent-teacher and/or IEP meetings. Finally, the GAL recommended that Father should have more parenting time with the minors during the summer "such as a week-to-week schedule with exchanges on Sunday nights to be coordinated with their older brother," Zander, who was Father's eldest child with another woman. She noted, however, that "such a long time without the other parent may be too much for Briggs, so [she] ***

5

suggest[ed] breaking it up with a mid-week exchange on Wednesdays overnight with the other parent."

¶ 13   An addendum to the GAL report was filed on January 23, 2025, wherein the GAL stated that she had met with the minors, individually and away from their parents, the day before the addendum was filed to determine if there were any changes or additional facts to consider since her last report. Briggs generally preferred to be at Mother's house because "he was able to do more things he liked to do there, like play on his tablet and play video games," activities he was not allowed to do as much at Father's house. Briggs did not understand why he could only do those things at one parent's house, and he seemed to "blame" Father for "being the mean one." Briggs, however, also reported that he really liked when Father built Legos with him.

¶ 14   Further, the minors reported that Father sometimes got upset when they texted Mother while in his care because it could "be used against him in court." For example, Briggs texted Mother that Father was not home, even though Mandy and Zander were home. Father "got upset because it made it seem like [Briggs] was left at home alone and he wasn't." Briggs interpreted this as though he was not allowed to text Mother while he was with Father, which upset him. When speaking to the GAL, Briggs called Father, "Roger," while he called Mother's boyfriend, Jason, "his dad." According to Reagan, Briggs only called Father "Roger" once at a school event, and it had not happened since that event.

¶ 15   Reagan described her experiences at each parent's house. According to Reagan, Mother let Briggs eat anything he wanted because he was very picky, and she let him do whatever he wanted. Reagan thought that Mother favored Briggs and babied him too much. In contrast, Father made Briggs try new things, including different types of foods. The GAL concluded that while Briggs preferred living with Mother and his perception of Father had changed since their last interview,

6

this was likely due to "the different parenting styles in the households." However, she was concerned that Briggs' perception of Father had changed so much since their last meeting and that he called Father, "Roger," to her. The GAL could not tell whether this was due to "something *** happening in Mother's household to discourage a relationship with [Father]" or a result of the different parenting styles.

¶ 16    Reagan, on the other hand, reported that she wanted to have "more time or as much time" as she could with Father. According to Reagan, she and Father had improved their relationship where she was able to talk to him more openly and no longer felt uncomfortable sharing things with him. Reagan also had a better relationship with Mandy, who was trying to be more involved. Unlike her last interview, Reagan now felt "like things ha[d] gone the other direction with [Mother]" because Mother did not like her friends, the way she dressed, and was too judgmental. She also claimed that Mother did not give her any privacy and sometimes went through her text messages. Reagan thought that Mother was trying to find things in her phone to use against Father in court. Similarly, Father was always concerned about what Reagan said in text messages to Mother because it could be used against him. Suffice it to say, Reagan was ready for this case to be over.

¶ 17    Regarding parenting time, the GAL changed her recommendations slightly in the addendum from her original report to the following:

> "Father having parenting time on an alternating week schedule as follows:
>
> Week 1: Father shall have Wednesday after school until Monday morning.
>
> Week 2: Father shall have either Wednesday afterschool until Thursday morning or after school on Thursday until Friday morning."

During the summer, she recommended that "parenting time be week to week as previously indicated with a mid-week exchange one night with the other parent."

¶ 18    A trial proceeded in this matter beginning on January 27, 2025. The GAL's testimony largely reflected the information set forth in her report and addendum. The GAL recommended the same parenting schedule that was in the addendum to her report (see *supra* ¶ 17), which would have given Father roughly 45% of the parenting time. When asked why she did not propose an even 50-50 split, the GAL stated,

> "[O]ne of the main reasons why I suggested a little lesser amount of time for [Father] is because [Mother] had primarily, through the course of the marriage and really through the course of the separation as well, had more availability to be able to care for the children, she is closer and she was the one who was primarily doing the day-to-day, like taking [the] kids [to] the doctor's appointments and such. She just had more availability to do that.

> \* \* \*

> Just given the practicality of their schedules. [Father] worked out of town. [Mother] worked in Vandalia. Just—unfortunately, she had more availability to do that."

¶ 19    Next, Mother testified that she filed for divorce from Father in June 2021. Mother was a junior high teacher at Focus and New Approach Schools, also known as alternative schools, which are schools "for children who have physical or behavioral differences." She worked Monday through Friday from 8 a.m. to 3 p.m., and she was off during school breaks and the summer. Mother testified regarding what she was seeking from Father in marital property, like bank accounts, retirement accounts, insurance premiums, and vehicles, among other things. Pursuant to a January 2022 court order, Father had to pay her approximately $828 per month in child support. However, between January 2022 and January 2025 he never paid the full amount of child support that was

8

due. Mother was therefore seeking any past due child support, in addition to any property settlement.

¶ 20     Mother testified that Briggs was diagnosed with "cognitive delay," and consequently, he had an Individualized Education Plan, or IEP, which included speech therapy. Father never attended Briggs' IEP meetings, even though Mother told him when the meetings took place. Briggs also had some sensory issues with food. Mother explained, "It causes him a lot of stress to try new foods; he becomes very upset." She further explained that Briggs thrived on a routine, and she was concerned that Father did not know how to handle his disability properly. Briggs' mindset was "very black and white." Thus, "[o]nce something [was] in his brain, that's what it is." Because of this, he sometimes referred to Father's girlfriend as his "mom at that house," and Mother's boyfriend as his "dad at [Mother's] house." Mother never encouraged or told Briggs to call her boyfriend "dad." Conversely, Jason initially was opposed to Briggs calling him "dad." According to Mother, Father was not civil with her and called her profane names in front of the minors, like "a f***ing c**t." Nevertheless, she encouraged the minors to have a healthy relationship with him.

¶ 21     Mother described the minors' evening routine with her. The minors took the bus home from school, where they would then have a snack and hang out with Mother, until she cooked them dinner. After dinner, they showered and did their homework. Mother had to help Briggs shower since he did not shower independently, and she oftentimes had to help Reagan with her homework since it was getting difficult. According to Mother, Briggs did not shower at all when he was with Father during the week. Briggs went to bed by 8:30 p.m., while Reagan's bedtime was no later than 9:30 p.m. Mother kept Reagan's cellphone in her room at night since otherwise Reagan would stay awake on it all night. Mother also purchased the "Bark app" for Reagan's phone because there had been "some instances of inappropriate things." The app let Mother know when Reagan was

9

using her phone, limit phone time if needed, and see things that caused concern. Mother denied ever looking through Reagan's phone "for evidence to use against [Father] in these court proceedings." However, she noticed that Reagan used her phone at unusual times when she was at Father's house, like until 5:30 a.m. one time.

¶ 22 During the summer, Mother often took the minors to free movie nights on Tuesdays and "snow cone Fridays" with their cousins, among other things. Mother had a lot of family members who lived nearby and were able to help her with the minors if needed. Mother did not like the schedule in the temporary parenting order because it was difficult for the minors to maintain a routine due to all the back and forth between both houses. Mother described her parenting style as "very routine oriented," so the minors always knew what to expect. She also liked to give Briggs choices since "free will" did not work very well for him. Mother spent a lot of time with the minors, explaining they were her "entire life." With respect to Father's parenting style during their marriage, Mother claimed he was easily angered, crabby, and not involved with the minors.

¶ 23 Reagan participated in basketball, band, chorus, and the national junior honor society. Mother attended Reagan's basketball games, both home and away, while she estimated that Father attended 75% of Reagan's home games. Father attended about half of Reagan's band performances, although Reagan also missed some performances during his parenting time. Likewise, Father attended around half of Reagan's chorus events. Mother testified that she had a good relationship with Reagan, although they sometimes "clashed" about Reagan's "hygiene choices" and how she dressed for school. Mother was very surprised the GAL report indicated that Reagan did not feel comfortable talking to her. However, she believed the length of the divorce had a negative impact on Reagan.

¶ 24    Mother believed that it was in Reagan's best interest to spend the majority of the time with her during the school year because she put more effort into helping Reagan with her homework and getting ready for school, among other things. She also had the school app, TeacherEase, that monitored Reagan's school work and contained notifications about what was going on in school, like her grades and/or missing assignments. Mother did not believe Father used the app or knew how "to do the day in and day out" with Reagan. Since Mother and Father separated in 2021, Father only used his two weeks of summer parenting time once, and he never asked Mother for additional parenting time. Mother was opposed to Father having the minors 50% of the time during the summer because he had to work during the day, while she did not, and she did not "see how sending [the minors] to a daycare or leaving them at home while the other parent work[ed] [was] beneficial to them."

¶ 25    Mother also testified about the domestic violence incident involving Father that occurred in January of 2021.[3] According to Mother, Father was angry with her because she had gone out with her friends during the day, while he stayed home with the minors. They went out together later that evening, while the minors stayed home with a babysitter. When they got home, Briggs was in their bed. Father then "climbed on top of [Mother] and ended up putting his hands around [her] neck in anger," while Briggs was lying next to her. Mother eventually got Father off her and called 911. Father, meanwhile, locked himself in the bedroom with Briggs, who was three years old at the time. When the police arrived, officers observed "marks all over" Mother. At some point, Father handed Briggs to an officer, but he remained barricaded in the bedroom. Officers eventually

_____

[3]We note that the circuit court judge, the Honorable Joshua C. Morrison, informed the parties that he had been the state's attorney on Father's domestic case where he pled guilty to resisting arrest (case No. 2021-CF-5). The case was ultimately disposed of after Judge Morrison's tenure as state's attorney and after he had already taken the bench. Nevertheless, Judge Morrison informed Mother and Father that they could "boot [him] off this case," but they both waived any potential conflict.

11

had to knock down the bedroom door and tase Father twice before arresting him. Mother stated there had been other prior instances of Father being domestically violent toward her, but she did not report them. According to Mother, Father had previously "struck" her and "behaved in a threatening manner" toward her in front of the minors.

¶ 26    The trial was recessed to April 7, 2025, after Mother's boyfriend, Jason, suffered a massive stroke. Meanwhile, the parties' judgment of dissolution of marriage was entered on March 3, 2025.

¶ 27    Father testified that he and Mother separated because she "was going out partying" and sleeping until 11 or 11:30 a.m. Father acknowledged the domestic incident that occurred between him and Mother, but he stated that he "hit a wall," not her face. Due to that incident, he had to temporarily live with a friend because there was a no contact order in place. Father had been employed as a sheet metal worker at K&K Metal Works for the past five years. He acknowledged that he did not pay any child support between May of 2023 and July of 2024, explaining that he "was trying to afford attorneys," so that he could get equal time with the minors.

¶ 28    Father claimed that since the temporary parenting order had been in place, he asked Mother for more time with the minors, but she refused, citing the court order. One exception was when Father had the minors for an overnight stay during Mother's parenting time after Jason had the above-mentioned stroke. He got the minors up and fed them breakfast before school. Father admitted that he did not know the names of any of Reagan's teachers, nor did he go to her parent-teacher conferences or open houses. However, he sometimes helped Reagan with her homework, especially math. Father also attended all of her in-town basketball games, but he did not attend her away games since he usually had Briggs on those days.

¶ 29    Father sometimes set limits regarding Reagan's "screen time." He generally did not restrict her phone time on weekends, but he would limit her phone time if he had her during the school

week. He did not know what Reagan's grades were in school, but he was "sure they're good." Father did not know what grade Briggs was in, nor did he know who his teacher was at school. Father did not know what Briggs' specific diagnosis was, and he did not know when Briggs' IEP was established. According to Father, he tried to go to a parent-teacher conference for Briggs, but he was "shut out." Father stated that Briggs was beginning to shower independently and that he reminded Briggs to take a shower during his weekend parenting time, typically one shower per weekend.

¶ 30 Father wanted equal parenting time where he and Mother would have alternating weeks with the minors. This was the schedule that Father had with the mother of his 17-year-old son, Zander, ever since Zander was two years old. Additionally, Father previously had custody of his younger sister, Chelsi, when she was a minor, after their parents died and he got back from the Navy. Father acknowledged that he did things differently than Mother, but he believed the minors needed "both sides of that," and also needed him in their lives. He made arrangements with his boss to be late for work and leave early during his parenting time. Father described a typical evening routine with the minors where he cooked them dinner while Reagan listened to music outside and Briggs played on his tablet. On weekends, Briggs generally went to bed around 9:30 or 10 p.m., while Reagan stayed up until about 11 p.m. Father did not use his two-week summer parenting time the last two years because he could not afford to take off work. He did, however, take the minors swimming and to the water park over the summer.

¶ 31 Following the trial, the Honorable Joshua C. Morrison recused himself for reasons not specified on the record.

¶ 32                                B. Circuit Court's Order

¶ 33    On February 17, 2026, the circuit court entered the parenting time order at issue in this

appeal. The Honorable Allan Lolie issued the order, but as he did not preside over the trial, he had

to decide the case based on the transcripts from the two-day trial. His order stated, "[t]his court

agreed to proceed in that fashion, however, the court must acknowledge that not viewing the

testimony live does place the court at a disadvantage." After summarizing the abovementioned

testimony and evidence, the circuit court reviewed the relevant best-interest factors pursuant to

section 602.7 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/602.7

(West 2024)).

¶ 34    In analyzing the best-interest factors for parenting time, the court noted that Mother wanted

more than 50% of the parenting time, while Father wanted at least 45%. Reagan wished to spend

the majority of the time with Mother, and more time with Father during the summer, while Briggs

had no preference. Regarding caretaking functions, the evidence showed that before and after the

parties separated, Mother performed the majority of the caretaking duties. Additionally, there had

been an Agreed Temporary Order in place since January 10, 2022. While temporary orders are

without prejudice, they are still relevant to the court. That order granted parenting time to Father

every other weekend from Friday at 4:30 p.m. to Sunday at 7 p.m., as well as every Tuesday and

Thursday from 4:30 p.m. to 8:30 p.m.

¶ 35    As to the minors' relationship with their parents and anyone else who might have

significantly affected their best interests, the minors had good relationships with both parents, in

addition to their older half-brother, Zander, who lived with Father half of the time. At the time of

the trial, Mother and Father both lived with new significant others. "There was no indication that

either child had an issue with either parent's significant other." Likewise, the minors were adjusted

to their home, school, and community, and were involved in extracurricular activities. While the GAL reported that Father had to undergo anger management counseling as a result of his Fayette County conviction for resisting arrest, there was "no proven issue of mental and physical health issues with the parties."

¶ 36 Regarding the minors' needs, Briggs had an IEP, and it was "undisputed that Mother ha[d] been the sole manager of that issue." Father was unable to articulate Briggs' diagnosis and did not know what grade he was in at school. To the extent Father claimed he was never given information about Briggs' IEP meetings, the court found it was "somewhat disingenuous of Father to just say he was never advised of the IEP issues," noting he had "a duty to be proactive and be involved with those issues." The court further noted there "was no indication that Mother purposely excluded Father from these issues," and found that she was better suited to deal with them due, in part, to her being a schoolteacher. The court also found that Mother was better suited to meet Reagan's daily needs as she had done for the past five years. Distance was not an issue since the parties lived within a few minutes of each other. The court likewise found that no parenting time restriction was warranted for either parent.

¶ 37 The court then analyzed the factor of physical violence or threat of physical violence by the parties against the minors or another member of the minors' household. Mother testified that Father had physically abused her in front of the minors more than once, a claim that Father disputed. Nevertheless, Father was charged with domestic battery against Mother after police were called to their residence and observed "marks on [Mother] indicative of abuse." During that incident, Father "barricaded himself in the bedroom with Briggs and had to be tased twice before submitting to arrest." Although the circuit court judge could not determine the credibility of the

15

parties since he did not preside over the trial, he noted it was "clear *** that Father had a serious issue requiring him to be tased twice, barricading himself with Briggs."

¶ 38　The court subsequently found that both parents could place the minors' needs above their own. While the GAL report indicated there had been issues with that in the past, the court found that its order would "alleviate any issue in this regard." Similarly, the court found that its order would alleviate any issue concerning Mother and Father's willingness to facilitate and encourage a close and continuing relationship between the other parent and the minors. The court noted that it had already addressed the abuse factor against the minors or another member of their household when it discussed Father's domestic violence incident. Last, the court noted that neither parent was a convicted sex offender or in the military.

¶ 39　After reviewing all the relevant factors, the circuit court ordered, as relevant here, the following allocation of parenting time:

"During the school year, Father shall continue to exercise parenting time every other weekend from Friday at 4:30 p.m. until Sunday at 7:00 p.m. Additionally during the school year, Father shall continue having the children every Tuesday and Thursday from 4:30 p.m. to 8:30 p.m. During both of these parenting time periods, Father shall require the children to complete any homework assigned to them which is due the next school day. All other school year parenting time shall be with [M]other except for holidays. The children shall also be allowed to participate in extracurricular activities during Father's parenting time. During Summer Break, Father shall have the same parenting time, however, the Tuesdays and Thursdays shall be overnight. Each parent shall also have the children for two non-consecutive weeks. Each party shall notify the other 30 days in advance of the two weeks

16

of Summer parenting time. These periods shall not be during holiday parenting time unless it is already that parent's scheduled parenting time."

While the court acknowledged this schedule deviated from the GAL's recommendation, it found the schedule was appropriate given that Mother had been exercising the majority of the parenting time for almost five years. The court adopted the same alternating holiday schedule that was set forth in the temporary order, and it provided that the parties would continue exercising joint decision-making authority. Finally, the parties were prohibited from discussing the case and child support with the minors. They were also "encouraged to cooperate in every way to assist the other with any unavoidable schedule changes."

¶ 40    Father filed a timely notice of appeal, which was expedited pursuant to Illinois Supreme Court Rule 311(a) (eff. July 1, 2018).

¶ 41                                II. ANALYSIS

¶ 42                    A. Mother's Motion for Sanctions against Father

¶ 43    Initially, we must address Mother's motion for sanctions against Father, which was taken with the case on May 19, 2026. Mother argued that Father "wholly and completely made up precedent in his Appellate Brief" where "none of the cited information [was] consistent with the actual opinions." Additionally, he repeatedly cited caselaw that did not support the propositions asserted, in violation of Illinois Supreme Court Rule 137(a) (eff. Jan. 1, 2018). That rule provides, in relevant part, that:

>       "A party who is not represented by an attorney shall sign his pleading, motion, or other document and state his address. *** The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion or other document; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well

17

grounded in fact and is warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." Ill. S. Ct. R. 137(a) (eff. Jan. 1, 2018). Mother speculated that Father "created his Appellant's brief using Artificial Intelligence" (AI) and asked us to sanction him by striking his brief, dismissing the appeal, and ordering him to pay attorney fees.

¶ 44　In response, Father argued that any errors in the citations, quotations, or authorities contained in his brief were "inadvertent and not made in bad faith." Although Father did not dispute Mother's claim that he used AI to draft his appellate brief, he stated that he "did not knowingly fabricate authority, intentionally misquote cases, or attempt to deceive the Court." He asked us to address his appeal on the merits and deny Mother's motion for sanctions against him.

¶ 45　Illinois Supreme Court rules governing practice in the appellate court are mandatory, even for *pro se* litigants like Father. *Voris v. Voris*, 2011 IL App (1st) 103814, ¶ 8. While we may, in our discretion, strike a brief and dismiss an appeal based on an appellant's failure to comply with those rules, we recognize that doing so is a harsh sanction and is appropriate only when the violations of procedural rules hinder our review. *Litwin v. County of La Salle*, 2021 IL App (3d) 200410, ¶ 11. Here, Father's brief contains general citations to cases that exist and does not directly quote any of those cases. Insofar as most of his propositions are not supported by the citations, this violates Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020), which states that the argument section of an appellant's brief "shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." As this violation does not hinder our review, especially since Mother has provided us with a cogent brief, and Father

18

has otherwise substantially complied with the rules, we decline to impose any sanctions against him and therefore deny Mother's motion. However, we urge Father to refrain from such noncompliance going forward.

¶ 46                                B. Father's Appeal

¶ 47    On appeal, Father argues that the circuit court (1) erroneously relied on "outdated" GAL evidence, while it failed to consider the GAL's 2025 addendum; (2) failed to consider the circumstances that led to Mother being the primary caretaker; (3) improperly relied solely on the parties' January 2022 agreed temporary parenting order; (4) did not properly weigh Father's parenting history; (5) improperly found he lacked involvement in school and extracurricular activities; (6) erroneously imposed a parenting restriction on him; (7) relied on unproven allegations; (8) relied on speculation, rather than evidence; and (9) committed reversible error when the court awarded Mother the majority of the parenting time based on the totality of the evidence in this case.

¶ 48    Section 602.7 of the Act governs the allocation of parenting time and requires the circuit court to allocate parenting time "according to the child's best interests." 750 ILCS 5/602.7(a) (West 2024). In determining the child's best interests for purposes of allocating parenting time, the court must consider all relevant factors, including, but not limited to, the following factors set forth in section 602.7(b):

> "(1) the wishes of each parent seeking parenting time;
>
> (2) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to parenting time;
>
> (3) the amount of time each parent spent performing caretaking functions with respect to the child in the 24 months preceding the filing of any petition for allocation of parental responsibilities or, if the child is under 2 years of age, since the child's birth;

19

(4) any prior agreement or course of conduct between the parents relating to caretaking functions with respect to the child;

(5) the interaction and interrelationship of the child with his or her parents and siblings and with any other person who may significantly affect the child's best interests;

(6) the child's adjustment to his or her home, school, and community;

(7) the mental and physical health of all individuals involved;

(8) the child's needs;

(9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

(10) whether a restriction on parenting time is appropriate;

(11) the physical violence or threat of physical violence by the child's parent directed against the child or other member of the child's household;

(12) the willingness and ability of each parent to place the needs of the child ahead of his or her own needs;

(13) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child;

(14) the occurrence of abuse against the child or other member of the child's household;

(15) whether one of the parents is a convicted sex offender or lives with a convicted sex offender and, if so, the exact nature of the offense and what if any treatment the offender has successfully participated in; the parties are entitled to a hearing on the issues raised in this paragraph (15);

(16) the terms of a parent's military family-care plan that a parent must complete before deployment if a parent is a member of the United States Armed Forces who is being deployed; and

(17) any other factor that the court expressly finds to be relevant." *Id.* § 602.7(b).

¶ 49     A circuit court's decision regarding the allocation of parenting time is afforded significant deference as the court generally is in the best position to assess the credibility of the witnesses and

determine the child's best interests. *In re Marriage of Whitehead,* 2018 IL App (5th) 170380, ¶ 15. Thus, a reviewing court will not reverse the lower court's decision unless the court abused its considerable discretion or its decision is against the manifest weight of the evidence. *Id.* A decision is against the manifest weight of the evidence when the opposite conclusion is clearly evident or when the court's findings are unreasonable, arbitrary, or not based on the evidence. *Jameson v. Williams*, 2020 IL App (3d) 200048, ¶ 47.

¶ 50    In this case, the circuit court judge who issued the order allocating parenting time was not the same judge who presided over the parties' trial where live witness testimony was presented. Consequently, the judge who issued the allocation order had to decide the case based on the transcripts from the two-day trial. Thus, he was in no better position than we are in terms of assessing the witnesses' credibility and determining the minors' best interests. Under these circumstances, we are inclined to employ *de novo* review, although we would reach the same conclusion under any of the aforementioned standards. See, *e.g.*, *In re M.D.*, 2021 IL App (1st) 210595, ¶ 26 (reviewing the trial court's neglect finding *de novo* where the finding was based upon a stipulated record and not based upon any observations of witnesses or their testimony; therefore, the trial court was in no better position than the reviewing court to assess credibility or weigh the evidence); *Alderson v. Southern Co.*, 321 Ill. App. 3d 832, 846 (2001) (reviewing the trial court's jurisdiction determination *de novo* where the court did not hear courtroom testimony and determined the issue solely on the basis of documentary evidence); see also *Norskog v. Pfiel*, 197 Ill. 2d 60, 70-71 (2001) ("If the facts are uncontroverted and the issue is the trial court's application of the law to the facts, a court of review may determine the correctness of the ruling independently of the trial court's judgment.").

21

¶ 51    After conducting an independent review of the record before us, we find no error in the circuit court's decision allocating a majority of the parenting time to Mother. The circuit court's allocation order addressed all relevant statutory factors and contained detailed findings as to each factor. As we have already delineated those findings above, we refer to our earlier review of the court's order.

¶ 52    Father initially contends that the circuit court erroneously relied on "outdated" GAL evidence and failed to consider the GAL's 2025 addendum concerning the minors' wishes. We disagree. In the allocation order, the court expressly stated that it considered the GAL's report, but nevertheless deviated from the recommendation therein after reading the trial transcript. In doing so, the court noted, "For nearly five years, Mother ha[d] been exercising the majority of [the] parenting time." To the extent Father claims the court failed to consider the minors' wishes, the court stated that Briggs had no preference, even though the addendum indicated that he generally preferred to be at Mother's house. The court also stated that Reagan wanted to spend the majority of the time with Mother, and more time with Father during the summer. While the addendum indicated that Reagan wanted to have "more time or as much time" as she could with Father, it also suggested that Reagan's recent attitude toward Mother stemmed from typical teenager issues. For example, Reagan complained that Mother did not like her friends, the way she dressed, was too judgmental, and invaded her privacy. She also complained that Mother went through her phone and was trying to find things to use against Father in court. Similarly, Father "was always concerned about what she said in text messages to [Mother] because it could be used against him." The GAL thus concluded that Reagan was ready for this case to be over. In any event, we cannot say the lower court relied on "outdated" GAL evidence or did not consider the 2025 addendum, as the court plainly stated otherwise and the record does not support that assertion.

22

¶ 53    Father next contends that the circuit court failed to consider that the January 2022 temporary parenting order led to Mother being the primary caretaker since it granted her a majority of the parenting time. He further contends that the court improperly relied exclusively on that order. We reject both of these contentions. The court had to consider the temporary order under section 602.7(b)(4) of the Act (750 ILCS 5/602.7(b)(4) (West 2024)), which provided that "any prior agreement or course of conduct between the parents relating to caretaking functions" of the minors was relevant. *Id*. Additionally, the court had to consider "the amount of time each parent spent performing caretaking functions with respect to the [minors] in the 24 months preceding the filing of any petition for allocation of parental responsibilities." *Id.* § 602.7(b)(3). The court found it was "undisputed" that Mother "performed the majority of the caretaking functions" during that time. In other words, Mother performed the majority of the caretaking functions before (and after) the January 2022 temporary parenting order was entered. Father admitted as much at trial.

¶ 54    We likewise reject Father's contention that the circuit court "failed to properly weigh [his] demonstrated parenting history" with respect to his older son, Zander. While the court acknowledged that Father had joint-custody of Zander and that the minors had no issue with their older brother, it was not required under the Act to consider Father's parenting history as to Zander. Rather, the relevant factors focused on Father's parenting history with respect to the minors at issue in this case. Father further contends that the court "mischaracterized" his involvement in the minors' school and extracurricular activities "by ignoring communication barriers." We disagree.

¶ 55    The court specifically noted Father's testimony that he was never provided with the information concerning Briggs' IEP meetings. However, the court found the testimony "somewhat disingenuous" since Father had "a duty to be proactive and be involved with those issues." The court further found that "[t]here was no indication that Mother purposely excluded Father from

23

these issues." We find that the lower court properly considered Father's lack of involvement in the minors' school and extracurricular activities. Father admitted that he did not know what grade Briggs was in or who his teacher was at school, and he could not articulate Briggs' diagnosis. While Father attended most of Reagan's home basketball games and some of her band and chorus events, he did not know any of her teachers or what her grades were in school, and he did not attend any of her parent-teacher conferences or open houses.

¶ 56    Father's contention that the circuit court essentially imposed a parenting time restriction by putting in place "a parenting schedule that significantly limits [his] time" is also without merit. Under the Act, a " '[r]estriction of parenting time' means any limitation or condition placed on parenting time, including supervision." *Id.* § 600(i). The circuit court found that no parenting time restriction was warranted for either parent, and did not impose any such restriction as defined by the Act. We do not agree with Father that the allocation of less parenting time constituted a restriction, and he has not cited any relevant legal authority to support that claim.

¶ 57    Although Father contends the circuit court improperly relied on "unproven allegations" regarding the domestic violence incident, the record shows that the court simply recited Mother and Father's respective testimony as to the incident and even acknowledged that it was "unable to determine the credibility of the parties as to the domestic battery." Moreover, Father has not specified which "unproven allegations" the court supposedly relied on with respect to the domestic violence incident, and it is not our job to sift through the record to find support for a determination favorable to Father's position. See *Private Bank v. Silver Cross Hospital & Medical Centers*, 2017 IL App (1st) 161863, ¶ 36 ("This court is not required to sift through the record to find support for an issue, and ill-defined or insufficiently presented issues that do not satisfy the rules may be considered forfeited."). To the extent Father in his reply brief suggests the court improperly relied

24

on the "criminal aspect" of the domestic violence incident because the related criminal charges against him were dismissed, this ignores that he pled guilty to resisting arrest (case No. 2021-CF-5). In any event, the court was permitted to consider "the physical violence or threat of physical violence" by Father against Mother. See 750 ILCS 5/602.7(b)(11) (West 2024). Mother testified that there had been other instances of physical violence aside from the January 2021 incident where Father "struck" her and "behaved in a threatening manner" toward her. Accordingly, we reject his contention that the lower court impermissibly relied on "unproven allegations" concerning the domestic violence incident.

¶ 58   Father further contends that the circuit court relied on speculation, rather than evidence, when it found that its allocation order would "alleviate" any issues he and Mother had with respect to placing the minors' needs above their own and facilitating and encouraging a close and continuing relationship between the other parent and the minors. While it is not entirely clear, Father appears to argue that there was no evidence to support the court's finding because the parties had been operating "under a substantially similar parenting arrangement" for the last several years during which "communication difficulties and co-parenting concerns" continued to exist. However, Father overlooks that the court's current allocation order was not in place during that time and that the order aims to correct those past issues. For example, the allocation order stated that Mother and Father were prohibited from discussing this case with the minors, as well as child support with them. Additionally, they were "encouraged to cooperate in every way to assist each other with any unavoidable schedule changes." This is not speculation; it is the court's order going forward.

¶ 59   Last, Father contends that the totality of the evidence in this case demonstrated reversible error. We disagree for the reasons explained above. The circuit court properly considered the

25

relevant statutory factors, and we find no error in its allocation order awarding the majority of the parenting time over the minors to Mother, while granting Father reasonable parenting time. Furthermore, we find no error in the court's decision to grant the parties joint decision-making authority. The decision of the trial court is not against the manifest weight of the evidence and does not demonstrate an abuse of discretion.

¶ 60                                III. CONCLUSION

¶ 61    For the reasons stated, the circuit court did not err in allocating a majority of the parenting time over the minors to Mother. The judgment of the circuit court is affirmed. Additionally, as set forth, Mother's motion for sanctions against Father is denied.

¶ 62    Affirmed.